IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DEENA ENFINGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-cv-114-WHA |
| | ) | [WO] |
| | ) | |
| EDWARD ELLINGTON, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.   Introduction**

This case is before the court on a 42 U.S.C. § 1983 complaint filed by Deena Enfinger. Enfinger alleges that her constitutional rights were violated while she was in custody of the Alabama Department of Corrections ("ALDOC") and housed at ALDOC's Montgomery Women's Facility in Mt. Meigs, Alabama.[1]  (Doc. 24).  Enfinger alleges that her constitutional rights were violated when she was denied the use of an inhaler for her asthma, when she was charged three dollars per sick call, and when a mental health nurse spoke with the warden about the advisability of a transfer to another facility.  (Doc. 24). Enfinger also alleges that overcrowding at the Montgomery Womens' facility creates unconstitutionally unsafe and unsanitary conditions.   (Doc. 24).   Enfinger names as Defendants Warden Edward Ellington, Nurse Rita Bryant-Smith, LPN (designated in the

---

[1]Since filing this action, Enfinger has been released from state custody.  (Doc. 60).

complaint as "Nurse Smith"), and Beth Whatley, MS, MHP (designated in the complaint as "Mrs. Whatley"). Enfinger seeks a injunctive relief and monetary damages for the alleged violations of her constitutional rights.

The Defendants have filed answers, reports, and relevant supporting evidentiary materials, including affidavits, addressing Enfinger's claims for relief. (Docs. 22, 23, 25, 35, 37, 38, 45). The court informed Enfinger that the Defendants' special reports may, at a future time, be treated as a motion for summary judgment and explained to Enfinger the proper manner in which to respond to a motion for summary judgment. (Doc. 46). Enfinger has responded to the reports and to the supplemental reports. Pursuant its June 12, 2012 order (Doc. 46), the court deems it appropriate to treat the Defendants' reports as motions for summary judgment. Thus, this case is now pending on the Defendants' motions for summary judgment. Upon consideration of the motions and the evidentiary materials filed in support thereof, the court concludes that the Defendants' motion for summary judgment are due to be granted.

## II.    Standard of Review

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. Rule 56(a) ("The court

2

shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[2]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.

The Defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact.  Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may ... grant summary

---

[2]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions." Fed. R. Civ. P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination." *Id.*  "'Shall' is also restored to express the direction to grant summary judgment." *Id*.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it.")  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted).  Consequently, to survive the Defendants' properly supported motion for summary judgment, Enfinger is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed R. Civ. P. 56(e).  "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted."  *Anderson*, 477 U.S. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. 242).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment.  *Holifield v. Reno*, 115

4

F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the Defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.").  Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004).  What is material is determined by the substantive law applicable to the case.  *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the*

*Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts....  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (to establish a genuine dispute of material fact, nonmoving party must produce evidence such that reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a

*pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Enfinger fails to demonstrate a requisite genuine dispute of material fact in order to preclude summary judgment. *Matsushita*, *supra*.

### III.   Discussion

In her second amended complaint, Enfinger brings three separate claims. First, she alleges that, while incarcerated at the Montgomery Womens' Center, Nurse Rita Bryant-Smith refused to allow her access to a prescribed medication, and that the Montgomery Womens' Center charged her for medical treatment for chronic conditions. (Doc. 24 pp. 4-5). With respect to this claim, Enfinger seeks reimbursement, compensation for pain and suffering, and injunctive relief.

Second, Enfinger alleges that the Montgomery Womens' Center was so dirty, inadequate, disrepaired, and overcrowded as to amount to a constitutional violation. (Doc. 24 pp. 6-7). With respect to this claim, she seeks only injunctive relief. (Doc. 24 p. 7).

Third, Enfinger alleges that mental health technician Beth Whatley violated her right to confidentiality in her mental health records by discussing her mental health with Warden Ellington in a conversation regarding her readiness for a transfer to another facility. (Doc. 24 p. 8). With respect to this claim, Enfinger seeks compensatory and punitive damages.

7

(Doc. 24 p. 8).

## A.    Injunctive and Declaratory Relief

Unlike claims for monetary relief, claims for injunctive and declaratory relief are prospective in nature, and are intended to prevent future injuries. *Smith v. Allen*, 502 F.3d 1255, 1267 (11th Cir. 2007), abrogated on other grounds by *Sossamon v. Texas*, 131 S.Ct. 1651 (2011); *Adler v. Duval County Sch. Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997). "When the threat of future harm dissipates, the plaintiff's claims for equitable relief become moot because the plaintiff no longer needs protection from future injury." *Adler*, 112 F.3d at 1477. Accordingly, absent class certification, the general rule in this circuit is that release of a prisoner will moot that prisoner's claims for injunctive and declaratory relief from prison conditions. *Smith*, 512 F.3d at 1267; *McKinnon v. Talladega County, Ala.*, 745 F.2d 1360, 1363 (11th Cir. 1984); *Zatler v. Wainwright*, 802 F.2d 397, 399 (11th Cir. 1986).

In October 2012, Enfinger was released from ALDOC's custody. (Doc. 60). There is no basis for concluding that she is likely to be recommitted to ALDOC custody at the Montgomery Women's Facility. (*See* Doc. 70). Thus, Enfinger no longer has any legally cognizable interest in any potential prospective injunctive relief granted against the Defendants regarding the procedures or conditions at any of ALDOC facilities. *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) ("[T]he capable-of-repetition" exception to the mootness doctrine "applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged

illegality."); *see also  Smith*, 502 F.3d at 1267 (holding that reincarceration within the ADOC prison system during the pendency of a lawsuit revived a prisoner's earlier claim challenging an ADOC ruling that he could not possess a religious crystal).

Accordingly, Enfinger's claim alleging that the Montgomery Women's Center facility was dirty, overcrowded, inadequate, and in disrepair is due to be dismissed as moot, because she seeks only injunctive relief with respect to that claim.  Enfinger's claims for injunctive and declaratory relief with respect to her remaining claims are also moot.  *Smith*, 502 F.3d at 1267 ("[O]nce the prisoner has been released, the court lacks the ability to grant injunctive relief and correct the conditions of which the prisoner complained"); *McKinnon*, 745 F.2d at 1363 ("The general rule is that a prisoner's transfer or release from a jail moots his individual claim for declaratory and injunctive relief.").

## B.    Absolute Immunity

With respect to any claims Enfinger lodges against the Defendants in their official capacities, they are entitled to absolute immunity from monetary damages.  Official capacity lawsuits are "in all respects other than name . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  A state official may not be sued in his or her official capacity unless the state has waived its Eleventh Amendment immunity or unless Congress has abrogated the state's immunity.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Dellmuth v. Muth*, 491 U.S. 223, 227 (1989).  "Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521,

9

1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997). Therefore, Alabama state officials are absolutely immune from claims for monetary damages brought against them in their official capacities. *Id.*

Thus, in their official capacities, the Defendants are entitled to sovereign immunity under the Eleventh Amendment and are absolutely immune from claims seeking monetary damages. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994).

## C.   Refusal to Provide Prescribed Medication

Prison medical personnel's "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (citations omitted).  "'To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry.'" *Id.* (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)).  First, the plaintiff must prove that she had an objectively serious medical need: either a need that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a lay person would easily recognize the necessity of medical attention.  *Id.*  Further, to qualify as a serious medical need, it must be one that, if left unattended, poses a substantial risk of serious harm.  *Id.*  Second, to satisfy the subjective element of the claim, the plaintiff must prove that the

defendant showed deliberate indifference to the medical need. *Id*. This requires a showing of "(1) [the defendant's] subjective knowledge of a risk of serious harm; [and] (2) disregard of that risk;. . . (3) by conduct that is more than mere negligence." *Id*.

Prior to Enfinger's January 5, 2012 transfer to the Montgomery Women's Center, she was housed at Julia Tutwiler Prison, where she was prescribed an albuterol inhaler for chronic obstructive pulmonary disease ("COPD"). (Doc. 24 p. 1; Doc. 37-1 ¶¶ 5, 10). Enfinger was allowed to keep one albuterol inhaler on her person for use as needed. (Doc. 37-1 ¶ 11). Enfinger alleges that, after her transfer to the Montgomery Women's Center, on or about February 7, 2012, Nurse Rita Bryant-Smith refused to provide her with an albuterol inhaler. (Doc 12 p. 2; Doc. 24 p. 4). Enfinger has not submitted an affidavit, sworn statement, or other evidence to support these allegations.

Medical records show that, on February 6, 2012, Enfinger received an albuterol (ventolin) inhaler to keep on her person. (Doc. 37-1 ¶ 12; Doc. 37-2 p. 4). Enfinger's signature appears in the medical record acknowledging receipt of the inhaler on that date. (Doc. 37-2 p. 4). Enfinger has not come forward with evidence showing that, upon her transfer to the Montgomery facility, she was not allowed to keep the inhaler in her possession. Undoubtably, Enfinger has a serious medical need for an inhaler to keep on her person, but she has not shown that she has a serious medical need for *two* inhalers. *Brown*, 387 F.3d at 1351 (holding that an objectively serious medical need is a need that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a lay person

would easily recognize it).  Thus, the uncontradicted evidence establishes that she was not subjected to unnecessary pain and suffering or a risk of serious harm by being deprived of a second albuterol inhaler.  *See LaMarca v. Turner*, 995 F.2d 1526, 1535 (1993) (holding that the Eighth Amendment prohibits deliberate indifference to a condition of confinement that causes unnecessary pain and suffering).

Moreover, in carrying out her duties, Nurse Bryant-Smith does not dispense albuterol inhalers to anyone; medication, including inhalers, are dispensed in the pill call line.  (Doc. 37-1 ¶ 12).  Nurse Bryant-Smith has submitted an affidavit and copies of Enfinger's medical records which show that Enfinger did not request an albuterol inhaler from Bryant-Smith and that Bryant-Smith did not refuse to provide an inhaler. (Doc. 37-1 ¶¶ 9, 10).  Accordingly, Enfinger cannot demonstrate that Nurse Bryant-Smith was deliberately indifferent to a serious medical need because she cannot show that Nurse Bryant-Smith knew that Enfinger needed a new inhaler or deliberately failed to provide her with one.  *See Brown*, 387 F.3d at 1351 (holding that, to establish and Eighth Amendment claim for deliberate indifference, the prisoner must show that the defendant had subjective knowledge of a risk of serious harm and disregarded that risk).

Accordingly, the Defendants are entitled to summary judgment on Enfinger's claim of deliberate indifference to her need for an albuterol inhaler.

**D.     Three-Dollar Co-Pay For Sick Calls**

Pursuant to Alabama Department of Corrections regulations, a co-pay of $3.00 is

assessed for nursing sick call visits if the visit is unrelated to a chronic condition.  (Doc. 37-1 ¶ 13).  Enfinger alleges that she was charged three dollars for every sick call, even though she is a chronic care patient.  (Doc. 21 p. 4).  Enfinger has not alleged any facts implicating a constitutional or statutory violation with respect to the three-dollar co-pay charge, and her inability to afford the co-pay did not prevent her from being provided medical care.  (Doc. 23-3 pp. 1-7; Doc. 37-1 ¶ 13; Doc 37-2 pp. 1-12).

Absent a constitutional or federal statutory violation, federal courts are required to show deference to the decisions of state officials in the procedures for the management of prisons, and such deference is "especially warranted in the fine-tuning of the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).  Therefore, an allegation of prison officials' non-compliance with a prison regulation is not, in itself, sufficient to give rise to a claim under § 1983 upon which relief may be granted.  *Id.* at 482-83, 485 (noting that prison regulations "are primarily designed to guide correctional officers in the administration of a prison" and that "such regulations are not designed to confer [constitutional] rights on inmates").   Consequently, because Enfinger alleges that the assessment of the three-dollar co-pay was, at most, a violation of prison procedures and regulations, this claim is due to be dismissed.

**E.    Alleged Violation of Privacy**

In her second amended complaint, Enfinger alleges that, in a conversation regarding Enfinger's fitness for transfer to a work release facility in Birmingham, mental health

technician Beth Whatley discussed her mental health with Warden Ellington and, in the process, related unspecified false information.  (Doc. 24 p. 8).  In a previous complaint, Enfinger alleged that, during a conversation regarding a transfer, Ellington stated that "mental health" had told him that she was "trying to beat the system."  (Doc.12 p. 3).

 Enfinger acknowledges that she has "mental health problems," including bipolar disorder, anxiety disorder, and panic disorder.  (Doc. 1 p. 2).  She states that, in 2005, she had a "nervous break down" while incarcerated, and, around the time of her anticipated transfer, a work assignment to kitchen detail exacerbated her anxiety.  (Doc. 1 p. 2; Doc. 35-1 ¶ 4).

On January 20, 2012, Enfinger requested to see a mental health professional because she was experiencing anxiety.  (Doc. 35-1 ¶ 4).  On January 26, 2012, the supervising psychiatrist treated Enfinger for anxiety and panic that began when she started working in the kitchen.  (Doc. 35-1 ¶ 4).  He prescribed Vistaril, and Enfinger agreed to take the prescription.  (Doc. 35-1 ¶ 4).  She began taking the prescription in February of 2012.  (Doc. 35-1 ¶ 4).

On February 13, 2012, the Alabama Department of Corrections contacted Whatley to inquire whether certain inmates, including Enfinger, were cleared for transfer from one facility to another.  (Doc. 35-1 ¶ 5).  Because Enfinger had just started her Vistaril prescription and it was not yet known whether the medication had stablilized her anxiety and panic attacks, Whatley advised that Enfinger was not ready for transfer and that she would be rechecked on May 1, 2012.  (Doc. 35-1 ¶ 5).

On February 27, 2012, Enfinger had a follow-up consultation with Whatley. (Doc. 35-1 ¶ 6). Enfinger stated that the medication was intensifying her anxiety and she refused to continue taking her medication. (Doc. 35-1 ¶ 6). Enfinger brought up the matter of her delayed transfer to a work release facility in Birmingham, and Whatley explained to Enfinger that she needed to be stable before being transferred. (Doc. 35-1 ¶ 6).

On March 25, 2012, Enfinger asked Whatley why she supposedly told Warden Ellington that Enfinger was trying to manipulate the system. (Doc. 25-1 ¶ 7). Whatley told Enfinger that the only thing she told the warden was that Enfinger could not be cleared for transfer due to recent medication changes and because she was not yet stable. (Doc. 35-1 ¶ 7). Whatley also told Enfinger that she could be rechecked for stability and readiness for transfer at a later date. (Doc. 35-1 ¶ 7).

On May 4, 2012, Whatley evaluated Enfinger. Enfinger was experiencing anxiety, including panic attacks and paranoid thoughts about falling out of her bunk. (Doc. 35-1 ¶ 8). Whatley concluded that, because Enfinger's symptoms had worsened, she was not stable and not ready to be cleared for transfer. (Doc. 35-1 ¶ 9).

Warden Ellington has provided an affidavit describing a conversation with Beth Whatley:

> In reference to the conversation I had with Mrs. Beth Whatley, Mental Health Professional, during one of my Monday morning meetings, with Classification, Health Care Nurse Manager, and the Captain over security; we will discuss various topics from inmate behavior and other security issues. We also discuss the inmates that are pending being transferred to Birmingham Work Release. The Health Care Nurse Manager and Mental Health Professional will review

the list along with the Classification Specialist to determine who is cleared for transport. Inmate Deena Enfinger was on the list to transfer to Birmingham Work Release. According to Mrs. Whatley, Inmate Enfinger was removed from the list due to her requesting to be taken off of her mental health medication. Ms. Whatley advised me that Inmate Enfinger needed to first be seen by the Mental Health Doctor and be observed at least ninety (90) days before she will clear Inmate Enfinger for transport to Birmingham Work Release. Ms. Whatley further stated that Inmate Enfinger requested to get off of her mental health medication in an effort to be released from the Mental Health caseload and hoping to be cleared for Birmingham quicker. Later during that week, I saw Inmate Enfinger and she asked me why she could not go to Birmingham. I advised Inmate Enfinger that I didn't have a problem with her going to Birmingham, but that she was not cleared by Mental Health. That is the only conversation I had with Inmate Enfinger pertaining to her transfer status.

As warden of this facility, I have a right to discuss all mental and medical issues of the inmates as pertaining to the security, custody, and control of them.

(Doc. 25-2).

Both Whatley and Warden Ellington considered the exchange of Enfinger's mental health information to be necessary to the administrative decision regarding the propriety of Enfinger's transfer to a work release facility in Birmingham.  (Doc. 25-2; Doc. 35-7 ¶ 9). However, Enfinger alleges that Beth Whatley's discussion of her mental health in relation to her transfer violated the "Privacy Act" and her own right to the confidentiality of her medical condition.

The Privacy Act of 1974,  5 U.S.C.A. § 552a, is inapplicable in this case because it does not apply to state agencies.  5 U.S.C. 551(1) (defining an "agency" as "each authority of the Government of the United States"); 5 U.S.C. 551(f)(a) (further defining the term

"agency" as it applies to United States Government authorities); *Ferguson v. Ala. Criminal Justice Info. Ctr.*, 962 F. Supp. 1446 (M.D. Ala.1997).

The rights provided by the Fourteenth Amendment do create certain "zones of privacy," which can include "the individual interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 598-99 (1977). "[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). "[P]rison inmates, in spite of their incarceration, 'retain certain fundamental rights of privacy'" including some rights to protection from disclosure of their medical information. *Harris v. Thigpen*, 941 F.2d 1495, 1513 (11th Cir. 1991) (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 5 n. 2 (1978)).

However, given the basic purposes and realities of correctional facilities, "loss of freedom of privacy" is an 'inherent incident of confinement in such a facility" and "any reasonable expectation of privacy that a detainee retained would be of a diminished scope." *Bell*, 441 U.S. at 537, 557. " [P]rivacy rights are among those most obviously curtailed by the fact of a prisoner's confinement in a correctional institution." *Harris*, 941 F.2d at 1515. Any retained constitutional right in the confidentiality of a prisoner's private medical information[3] is "necessarily subject to substantial restrictions and limitations in order for

---

[3]In *Harris*, 941 F.2d at 1513, the Eleventh Circuit assumed, without deciding, that prisoners had "some significant constitutionally-protected privacy interest in preventing the non-consensual disclosure" of their HIV-positive status. Likewise, in this case, the court need not decide whether Enfinger had a significant constitutionally-protected privacy interest in preventing mental health professionals from disclosing her mental health status to Warden Ellington and/or other officials participating in the transfer decision. For the reasons stated herein, even if Enfinger does have such a privacy right, the disclosure of the information did not unconstitutionally infringe on that right.

17

correctional officials to achieve legitimate correctional goals and maintain institutional security." *Id* at 1514.

One fundamental institutional purpose of a prison system is to detain inmates within the system's correctional facilities. *Bell*, 441 U.S. at 537. "[T]he practical necessities of prison administration require that the administrative decision to transfer an inmate" from one facility to another on the basis of "proper administrative and correctional criteria" is a matter "within the sound discretion of prison authorities." *U. S. ex rel. Gereau v. Henderson*, 526 F.2d 889, 896 (5th Cir. 1976); *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that cases decided by the 5th Circuit prior to October 1, 1981 are binding in the 11th Circuit). Another necessary function of prisons is providing for prisoners' basic medical needs, which cannot be achieved if administrative decisions regarding transfer to another facility or to work release are made without any consideration of a prisoner's known need for medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.").

Thus, consideration of an inmate's mental health is a proper administrative criteria for determining where the inmate should be housed, whether to transfer the inmate to work release, and whether the inmate is ready for transfer. This is particularly true in Enfinger's case in light of her known diagnoses of bipolar disorder, anxiety disorder, and panic disorder, her recent onset of anxiety and panic attacks as a result of a work assignment, the failure of

18

the medication to stabilize her anxiety and panic attacks, her decision to cease taking her medication, and her past history of a mental breakdown while incarcerated.[4]  (Doc. 1. p. 2; Doc. 35-1).  *See Martinez v. Burns*, 459 F. App'x 849, 851 (11th Cir. 2012) ("Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment."); *Dolihite v. Maughon*, 74 F.3d 1027, 1044 (11th Cir. 1996) ("Our case law does indicate that failing to transfer or accommodate the serious health needs of a prisoner could amount to a constitutional violation.");  *Pugh v. Locke*, 406 F. Supp. 318, 321, 333. (M.D. Ala. 1976), *aff'd and remanded sub nom. Newman v. State of Ala.*, 559 F.2d 283 (5th Cir. 1977), *cert. granted in part, judgment rev'd in part on other grounds sub nom. Alabama v. Pugh*, 438 U.S. 781, 98 S. Ct. 3057, 57 L. Ed. 2d 1114 (1978) (requiring Alabama Department of Corrections officials to develop a prisoner classification system for the placement and transfer of inmates to work release that included consideration of inmates' mental and physical health).

Moreover, the limited information Whatley disclosed to Warden Ellington in accordance with prison procedures consisted only of information relevant to Enfinger's medical readiness for transfer to the work release facility and was narrowly tailored to Ellington's administrative need for this critical information.  Thus, the disclosure was not an over-expansive or exaggerated response to the institutional need for the information for

---

[4]In fact, in her initial complaint, Enfinger asserted a claim (which she has since abandoned) that the prison violated her constitutional rights by *not* taking her mental health into account when assigning her to work detail in the kitchen. (Doc. 1 pp. 2-3).

purposes of deciding whether and when to transfer Enfinger to work release. *See Turner v. Safely*, 482 U.S. 78, 93 (1987) (holding that a regulation restricting prisoner correspondence was valid where, although it infringed on inmates' constitutional rights, the regulation was rationally-related to a legitimate penalogical interest and was not an exaggerated response to institutional needs).

Accordingly, any alleged violation of Enfinger's right to privacy regarding her medical information was not unconstitutionally abridged by Whatley's provision of information regarding her mental health to Warden Ellington. *Cf. Turner*, 482 U.S. at 2264; *Harris,* 941 F.2d at 516 (holding that, despite the fact that transfer of HIV-positive prisoners to segregated housing unit had the practical effect of disclosing prisoners' HIV status, the administrative decision to house HIV-positive inmates in the segregated facility was a legitimate exercise of prison's goals of providing health care, reducing HIV transmission, and protecting the HIV-positive prisoners from violence).

## IV.  CONCLUSION

Accordingly, it is the **RECOMMENDATION** of the Magistrate Judge that:

1.  The Defendants' motions for summary judgment (Docs. 23, 25, 35, 37, & 38) be **GRANTED**.

2.  Judgment be **GRANTED** in favor of the Defendants.

3.  This case be **DISMISSED** with prejudice.

4.  Costs be taxed against the plaintiff.

It is further

**ORDERED** that on or before **January 26th, 2015**, the parties may file objections to this Recommendation.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.   *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  See also *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 12th day of January, 2015.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE